v. Zurich American Insurance Company, etc. et al. May it please the Court, I'm Charles Roberts here for Zurich North American. This is a contract interpretation dispute that involves three pay plans that we contend are very unambiguous. There is really no language in these plans or any principle in New Hampshire law that supports the District Court's legal conclusion that Mr. Walsh earned incentive pay at a time when he was covered under a supplemental pay plan that provided extensive supplemental  So because nothing was vested or earned in December 2008 when the APCO deal closed, and because the August 2008 plan was modified in February 2009, two months before it was even scheduled to go into effect, we contend that the APCO part of the judgment should be reversed. And that's what I'd like to focus on. Let's take those one thing at a time. First, with respect to the August incentive pay plan, and I'll try to refrain from commenting on the execrable draftsmanship that went into that plan. But that plan was certainly unclear as to when the entitlement to compensation would attach. I know you've got an argument that that plan was later modified, et cetera. I'm just focusing on when the entitlement to compensation would attach. I don't think there's any lack of clarity. Give me some plan language that says when the entitlement to compensation occurs. Well, it says that the only phrase where it says it's earned, it uses it at one point in the plan where it says that the pay is earned, basically you earn it as the premiums come in. Well, it may be paid as the premiums come in. I've spent more hours than I like to think of trying to make some sense out of that plan. You know, you must have had it drafted by some mad scientist. All right? But I can't find any satisfactory language in the plan that indicates when an entitlement to compensation would occur. I can see the argument that the right to payment depends on when payment is received from the customer, but not when entitlement would vest. And the district court, which apparently had the same problem, left that question to the jury, which resolved the issue against you. Well, the jury found that agreement was reached, and the only issue it was asked to decide was whether an agreement was reached in August, and it found that there was. It wasn't asked to decide when that was. No, no, but the jury then went on to find that Zurich had intentionally and willfully breached the agreement by refusing to pay the money earned on the APCO transaction. Well, yes, it found that it was willful based on what we contend was focusing on the wrong time period, because there's no contention that the agreement was – in fact, the district court found that it was lawfully changed in February, at least prospectively. I don't think anyone is arguing here about whether it was changed. The question that had to be resolved in this case was whether that change, all right, could legally affect transactions that were negotiated and closed prior thereto. Now, it's clear that it could have had that effect if the documentation on both ends was clear enough, all right? But it wasn't, and the jury decided, all right, that there was a willful breach when there was a failure to pay in accordance with the terms of the August plan. Well, let me make a couple of points, Your Honor. I mean, one is that this plan – no one contends that this plan was in effect in December of 2008 when the APCO deal was – he was being paid under a – the October 2007 pay plan that continued to March of 2009, and that plan said that he received substantial supplemental payments expressly in lieu of any earned incentive. So you have to construe – you can't – in our opinion, you can't take the August 2008 plan and look at it in isolation. I agree with you. But when you look at the two plans together, I also see that there's a conflict, and I see that that's where the jury has to come in. Well, I would respectfully disagree that there's a conflict between the two plans. They're inconsistent with each other, but that's – they're inconsistent only if you take the position that they're both in effect at the same time. What they were addressing in August of 2008 was a future pay plan that would not even become effective until April the 1st of 2009 for Mr. Walsh. Why do I keep saying April? I thought that the plan itself expressly says January 1, 2009. Well, the plan says that the plan year is a calendar plan year, but it talks – there's specific language cited in our reply brief that talks about when an employee who comes into the territory or comes under the plan in the midst of the plan, then it starts at that time. And Mr. Walsh, by his own – by all the evidence – in fact, you know, the district court asked the parties, and they essentially agreed that there was no entitlement to be covered under the plan. There was no entitlement to premiums coming in in the first quarter of 2009. And so basically, you had an 18-month period where he was building up a new alternative distributions network, and they paid him extra money. They paid him $13,000 extra a month. So in the four months that he was negotiating the APCO deal, he was being paid his base salary plus $13,000 each month in recognition of the fact that there wouldn't be any premiums coming in during that time period. We think that when you read the plan itself, even if you read the August 2008 plan, with all due respect, I think that when you read it, it's clear that it's the stream of In fact, if you're terminating – Okay, counsel, may I – let me – yes. What is – there's this debate about what's a fixed interest – a fixed interest, what's a – what's a fixed interest, what's contingent? Other than the fact that the Appalachee could not claim commissions unless they were actually paid starting in April of 2009, other than that fact, what was contingent about those commissions? Other than the fact that he would have no entitlement to actually get the cash until they were paid. What was contingent of the plan? Well, the whole plan was not based on the sale. Remember, when they closed the APCO deal in December, nothing – there were no policies sold at that time. And what they entered into was a business relationship with APCO where APCO would, in the future, market plans that would then lead to premiums. You had no – nothing had been sold at that time. There was nothing fixed in December. You couldn't – you couldn't – it's not like a case where I sell a lawnmower or whatever and you wait for the payment to come in. There was nothing that I could – that he could even look at in December and say, oh, this is how much I will be entitled to if we receive the premiums. Because no one knew what was going to be sold. It was a future – But that's why you would start it in April, isn't it? If the idea is to incent him to work hard throughout the rest of 2008, you wouldn't know any of those things and you would start it in April. But again, he's covered under a pay plan that specifically says that it's in lieu of earned incentives. I don't see how you can reconcile that and say, oh, he earned – not only is he entitled to the supplemental payments, but he earned a deferred compensation that's directly contrary to the in lieu language. It was in lieu of that. Wasn't the background to the August 2008 agreement that he was thinking of leaving the company, apparently was not satisfied with his existing pay arrangement, and your client did not want to lose him, and so entered negotiations with him on an agreement that would persuade him to stay, and it's out of that background that you get this August 2008 agreement, which is designed to incentivize him to go out and do exactly what he did. Well, the October – he was threatening to leave in 2007, and that led to the October 2007 supplemental pay agreement, which was in effect explicitly through March. So through March 31st of 2009, he was covered under that plan, which was expressly in lieu of any earned incentives, and it's our position that, in essence, what the district court gives him is the benefit of two separate pay plans that are directly contrary to each other at the same time. He was being – he was – So you're saying he got supplemental pay based on the APCO transaction under the 2007 plan? No, he didn't. No. Because you did this separate deal with him in 2008 without revoking the 2007 plan, knowing that he would go from one to the other. So the only question is, as I see it, he got no compensation on APCO under the supplemental pay plan. The question is, does that – does the existence of the supplemental pay plan wipe out his ability to claim – to reap the benefits of the transaction that he negotiated with APCO? The jury construed those two contracts as saying that, no, one didn't wipe out the other. Your Honor, let me say this. I think he was paid supplemental pay for the APCO deal, and he started negotiating that deal in September. And in September, October, November, and December of 2008, he was not – he was being paid supplemental pay. But that supplemental pay wasn't geared to APCO, was it? No, but the pay plan isn't – So when the APCO deal closed under the terms of the August plan, right, I think it's a reasonable conclusion that he became – let's put aside your argument that that plan was subsequently revoked or didn't take effect. But under the terms of that plan, all right, he became entitled at the point he closed that deal to the benefits of the – that he negotiated for in August. You then tried to take those benefits away with the February revision, all right, but what the – what the district court said in – by refusing to give you the abuse of discretion judgment was that under New Hampshire law, you didn't have the power to take away an interest, an entitlement that he had already earned because he closed the deal and was merely waiting to get his cut of the proceeds as they were paid beginning in April. I would respectfully say that I disagree that the agreement is read that way. It's not linked to the sale. It's linked to – basically, you're always in arrears. The same would be true in 2009 if he had sold some new deal in 2009 that didn't generate premiums until 2010. There's no dispute that the plan could change at the end of 2009, so I don't see how it's really different, particularly when the plan includes discretion language that specifically allows the company to make changes. And even if – under New Hampshire law, it's not that you – you have a right to exercise discretion as long as you don't upset the initial intent of the parties or the expectations of the parties. And there was no defeating of the expectations of the parties. He was modeled with intent of $250,000 to $300,000. He got paid $398,000. But let me move to the willfulness issue because I do want to make clear that even if we're wrong, even if we're wrong on all of this, the focal point should have been on in July. These weren't lawyers that were making these decisions, and I think even the judge struggled throughout the trial in how to pigeonhole this case. You know, he went from one extreme to the other at different points until he finally settled upon how he viewed it. At the time of July 2009, they had changed the plan. Walsh had accepted it, perhaps reluctantly, but he had accepted it. He was being paid under it. He went – he got paid under it. He made no claim for APCO incentives under the old plan at any point in time thereafter. And basically, we say that in order to find willfulness, there at least has to be some evidence in the record that Zurich knew that it was earned. And I think that's impossible to say that Zurich knew it was earned when it changed it because that's a – respectfully, I still disagree. I don't think it was earned. I think the plan can be read in the way that it's only when the stream of premiums, particularly – Counsel, you have these statements of company officials which seem to amount to the proposition there is no way we're going to pay you what this – what this August 2008 agreement would call for because it would be unseemly to have you now earning more than some of the officials who are making these – who now want to set out on new negotiations as the president of the company. I mean, that – that sounds like agreement be damned. We're not going to allow you to collect these. But that assumes that we didn't – that we didn't believe we had the right to change it. I mean, the company – there's clearly discretion language that gives the company the right to change it. Counsel, even – even in the supplemental pay plan which you've relied upon, I mean, there is language in there that says the supplemental pay agreement is subject to cancellation by the senior vice president or dealer at any time. Is it your position that even that supplemental pay plan, which is so important to your – that could have been canceled at any time by the senior vice president? Well I think that would – I mean, that's the kind of language that appears in every one of these agreements. Well, there's also the language that – that's not in that plan, that is in the other one, the right to limit incentive in unique situations. And I don't know how – what a unique situation would be if this wasn't one where – where the expectations of the parties at a – you had a market that no one knew what the size of the market was going to be when they negotiated that thing. It turned out to be a lot larger. These plans were designed to provide a fair compensation. They were modeled to provide him compensation in the neighborhood of 250 to 300,000. The way the revisions were made, he got – he was paid 398,000 and we just would argue that at least from a willfulness standpoint, that there was no reason that Zurich should have believed that it had acted unlawfully. Even if Kane knew he was reneging on the agreement, that begs the question of whether he had – he believed he had the right to renege on the agreement. And that was the – that's the basic point, and that it wasn't inconsistent. If there's no further questions, thank you. Good morning, Your Honors. My name is Jamie Hage and I'm here for Mr. Walsh. With me at the council table are my co-counsel, Doug Miller, and Kathleen Davidson. This case is very clear that in the record – Well, that's one thing that's not true. Whatever else this case is, it's not clear. Well, it was clear as far as the jury was concerned, Your Honor. Well, the jury reached a decision that may or may not be supportable. But let's not go into hyperbole. Tell us what your arguments are. First, Your Honor, the – I guess I'll start where opposing counsel began and where you began in your inquiry. This is – first of all, first and foremost, this is a wage case, a New Hampshire wage case. And the issue on earning is when was his commissions or entitlement to pay earned? And based on the case law in New Hampshire, in the absence of a specific reference in the agreement to when it's earned, the general rule under Galloway and one other case that's cited in our brief is that it's earned when the sale is made. Just on that point, and this goes, I guess, to the question of willfulness, on that issue, once the jury decided that August 2008 agreement was an enforceable contract, once they decided that, the judge had ruled and I believe told them that the APCO deal, which closed in December of 2008, that he had earned at the time of the closing of that deal the commissions, which would not begin until April of 2009. Isn't that a legal determination that the court made and communicated to the jury? I'm not sure that he used the word – he said, you cannot consider discretion. If you find that there was a contract, the OA, then they did not have the right to change it. I think that's what the court said. Okay, so when they made their willfulness determination, they had been advised by the court that the company did not have a right to consider whether those commissions were owed to your client. Isn't that correct? Well, I don't think so, Your Honor. I think the jury still had to find there was a binding agreement. Sure. And if it thought that the February 2009 agreement, regardless of whether that was in the exercise of discretion or just the final agreement, the jury could have concluded that the 08 plan was not a binding and effective agreement. Without regard or considering any issue about discretion. Moreover, the willfulness finding in this case that the jury found with respect to both the APCO deal and the GAIC deal, there was ample evidence in the record to support this. Remember, Zurich tried this case on one primary basis, that there was no agreement in August of 08. That's the horse they rode. So they didn't want to talk about when anything was earned under the 08 agreement or what the terms of the 08 agreement were or whether they had the discretion to change it, because they were telling the jury the whole time, we didn't have an agreement based on the 08 plan. And, of course, they did. So in the jury's mind, once they found there was an agreement, and based on the statements that were made by the executives at Zurich, Cain said, according to Mr. Walsh's testimony, not that there wasn't a plan, not that we had the right to change it, I'm not going to pay you on that plan, the plan that's in effect, because it's too rich a deal and Zurich can't have it. That was the evidence upon which the jury, I submit, found willfulness with respect to the APCO deal. And with respect to the GAIC deal, there's even more evidence to support willfulness. You will recall the record shows in that case, with respect to GAIC, now we're dealing with the February 09 agreement that Zurich says is the agreement. And with respect to that agreement, to which the GAIC deal applied, they tried to change the deal after the fact by withholding from Walsh premiums that he had earned under the GAIC deal. There's actually an email saying we owe him this, but we've got to now amend the plan after the fact. So the jury heard evidence of what Cain said, what Zurich said as to why they couldn't pay him on the APCO deal. And then there was also written evidence that they were not going to pay him on the GAIC deal and they wanted to do it retroactively. So the point is, with respect to APCO, the law in New Hampshire is clear. If it's earned, if it's vested, and it's not – if it's earned and vested, you can't modify that retroactively. Excuse me. Go ahead. So stick to that, if it's earned or vested. I understand that the jury was asked to determine whether or not the 2008 agreement was a binding – was an incentive pay plan, was a binding agreement, right? But I haven't been able to satisfy myself that the jury was also asked to find that any compensation with respect to the APCO transaction was fixed or vested or earned, any verb you want to use, under that agreement. Was that issue ever submitted to the jury? Not as a jury – not as a specific jury verdict form. And I submit, Your Honor, that the – I'm not talking about the verdict form. What about the instructions? No. Was the jury – No, the – there was no instruction given to the jury about, you must make a determination of when this was earned. Was there any agreement among the parties that if the jury found that the 2008 agreement was binding, that then the plaintiff would be entitled to the amount that he was due on – that he claimed to be due on APCO? There was no agreement, Your Honor, but I don't think there was really an issue on that because Zurich was banking all – putting all its eggs in one basket, that the 2008 was not the agreement. That's what they were relying on. Counsel, I – just on the – with respect to the question that Judge Seid is raising, it was my understanding – I think I got this from the brief of appellants – that the judge made a legal ruling that when that APCO deal closed in December of 2008, that at that point your client had earned those commissions. Yes, there'd be no payment until the commissions started to come in, but when that deal closed, he had earned the commissions. They were vested. It was a fixed interest. Whatever language you want to use. And I understand that he based that ruling on his understanding of New Hampshire law. And so given that ruling, that was now a given in the case, and it was a given when the jury had to decide the willfulness issue as well. Isn't that correct? It wasn't that the state of the case when the jury was asked to decide if there was an enforceable contract in August of 2008? Your Honor, I thought that his instruction did not go to when it was earned, only that if you find – No, that was not a jury issue. He had made a legal ruling as to when it's earned. He didn't – he made a legal ruling – that legal ruling was made prior to it was submitted to the jury. Right. And he did it for two reasons. One, the plaintiff submitted as an additional claim that there was a breach of the implied covenant of good faith and fair dealing. And in the colloquy between the judge and counsel during that section, he said, and I think correctly so, that if the jury finds the 08 plan was an agreement, plaintiff, you don't have a claim for implied covenant of good faith and fair dealing. It either was or it isn't. So for that reason, I'm not going to give an instruction on implied covenant of good faith and fair dealing. And likewise, if the jury finds that there was an agreement, because under New Hampshire wage law, you can't change it retroactively, only prospectively. And based on the facts as was determined at trial, if the jury found that there was an agreement, then he said discretion doesn't play a role in that because it was earned before any change was made and you can't change the contract retroactively. So it boils down to the judge saying that bottom line, that if you find that there was a contract, all right, then the amount claimed on the APCO transaction is due. The jury wasn't to set the amount. The judge set the amount, all right? And what I don't understand, was that step of the judge determining that, was that done by some sort of explicit or tacit agreement or was that simply the judge overruling objections and deciding not to submit what would normally be thought of as a damages question to the jury? Well, there was an agreement, Your Honor, between counsel on the damages issue. That if the jury found that it was a binding contract, that the damages would be, in fact, Exhibit 140, Plaintiff's Exhibit 140, which I think is in the joint appendix 1294, was a stipulation, if you will, that the parties agreed that if the jury found that there was a binding agreement, then they calculated out what the commissions would have been on the APCO deal and what the commissions were that he was entitled to on the GAIC deal. Now, let's get into Judge Lopez's question. Was the jury aware of that stipulation at the time they determined whether the failure to pay was or was not willful? The jury wasn't told the dollar amount. The jury was told, in so many words, you don't have to consider damages. Okay. Because if you find, but I'm not, you know, he said something to the effect, I'm not saying there wasn't agreement, but if you find that there was an agreement, you don't have to consider damages. Okay. That's my recollection of what the court told the jury. Counselor, just for my clarification, I gather when your client agreed to the so-called replacement agreement in February of 2009, although he insisted that he was entitled to the commissions provided for in that August 2008 agreement with respect to commissions that were paid in April of 2009, that was a five-year deal with APCO, was it not? And I gather he then gave up any argument that he was entitled to the 1.25 rate of commissions with respect to the next four years of commissions. Is that correct? Yes, Your Honor. He did give that up. It was a claim that was part of our claim at the time we brought the action, but based on the fact that Zurich could change the plan in a subsequent year, in a subsequent year, even we thought, I think it was a litigation strategy not to overreach, that because he sold the APCO deal, and I want to just make something clear about the APCO deal, Your Honors. The only thing Zurich could sell was what it sold to APCO. My counsel calls it a business relationship. That was the sale, and they projected over $100 million in premiums, and they costed it all out. And they congratulated Jim for making that sale, and there was a public announcement about that sale. And then after that was all done, after it closed in early January of 2009, they said, we can't pay you on that plan. We have to change it. So when they introduced the February 2009 plan, Jim protested. He had meetings with Kane, but it was either Zurich's way or the highway. So he was forced to accept it. But the logic of his argument would be that he was entitled to that 1.25 rate on five years' worth of commissions. Is that not so? If one of two things happened, we would have been arguing that. One, if he remained with the company throughout that period of time. Because, remember, there is a provision in the incentive plan that says, upon termination, you only get incentives that were earned prior to termination. So he would have had to remain there with the company for five years. Or if they wrongfully discharged him and made it so impossible for him to remain at the company, he may have been able to claim that. But, of course, we gave up on that. I just need to ask one question about that. You're saying that even if they changed the plan on an annual basis, if those conditions had not been met, those two conditions, he would still be arguing for the full five years? If he was still at the company, they may have had the right to make modifications in a subsequent year, Your Honor. As to the previously earned? Our position, if he remained at the company, Your Honor, is that he would not have been able to do it. I don't think they would have been able to do that for the same reason they weren't able to do it for the first year. They would not have been able to do it? They would not have been able to do it. Under the state statute? Under the state statute and under the case law. Okay, I thought that's what you were saying. Yes. Because the deal closed and he earned it at that point in time. Thank you. Thank you.